I've been advised by the clerk of court that everyone who needs to be present is present, and so we'll proceed to hear the first case on our calendar this morning, which is number 21-2789 Grossman v. Geico Casualty Company.  Your Honors, and may it please the court, Roy Willey representing the appellate Grossman v. Geico Casualty Company et al. This case is actually very simple. This is a case about an insurance company that represented to the public and to consumers that it had saved considerable money, hundreds of millions of dollars as a result of the COVID-19 pandemic, and represented to those consumers that if they purchased or renewed policies, that these savings, quote, these savings would be passed on to consumers. However, what those consumers learned after purchasing or renewing their policies was that only a portion of those savings was actually passed on to the consumers. Well, wasn't the savings expressed in terms of a rate reduction of 15%? No, Your Honor. Initially... Well, okay, go ahead. Initially, the representation to the public and to consumers was that these savings were going to be passed on to consumers through marketing materials. Now, after that... And those are in the record? Yes, Your Honor. That statement is in the record. I believe it's at Appendix 13. It's Paragraph 30 of the complaint where that is cited. And, of course, this is before Your Honor is on a motion to dismiss, which was granted. I'm asking for the specific words because you bring a general business law claim, and most complaints generally contain the exact words because it requires a misrepresentation and deception. Correct. And I've read your complaint. In fact, I have pages 12 and 13 with me. That's why I asked you. I don't find any specific words here. Your Honor, Paragraph 30 of the complaint, it says, quote, shelter-in-place laws have reduced driving, and we are passing these savings on to our auto, motorcycle, and RV customers. Emphasis added in the complaint. We, of course, italicized the words, these savings, which is the important words. So it requires all the savings to be passed, I understand. That was the representation by the insurance company. The insurance company is not required to pass this. No, no, no. I understand that. But you say it requires all their savings. Correct. That was the representation by the insurance company. And the courts that have heard this case in Illinois and California found the same, a similar case, based on this same statement, same representation, same give-back program, got passed the motion to dismiss. In this case, it was a little different, because we did not even get to brief or argue the motion to dismiss. It was decided, as Your Honors know, based on the papers, on some pre-motion letters, which we reserve all rights as to that, and will rest on the papers. But I think the issue before the court— May I ask you a question? Yes, Your Honor. I did not see where you challenged in your rehearing motion the treatment of the letter exchanges as a motion. Did I miss something? Your Honor, I believe that it was mentioned in the rehearing motion. I do not believe— You didn't seek rehearing on the ground that the district court erroneously treated this letter exchange as the equivalent of a motion, or am I mistaken? Well, I think the issue is that we were never heard at the district level. No, you made a motion for rehearing. Correct. And it seems to me one would expect that on seeking rehearing you'd say, wait a minute, this got treated as a motion when all it was was a letter exchange, but you didn't do that. And so I'm concerned that this point is waived, because you didn't pursue it below in the district court. Well, I don't think that we had the opportunity to fully pursue it below. I believe that with respect to the rehearing motion, I understand Your Honor's concern that it was raised as an issue that these were decided on letter motion. I didn't see where that was an error cited in the rehearing, so that's what I'm asking you. Where did you tell the district court you thought it had heard in that respect? I don't know that it was specifically cited as an error in the papers. I would have to review— At that time, you also had the opportunity to raise any challenge in the rehearing, correct? So why wouldn't this be a harmless error, assuming it's error, treating these letters as motions? Well, I think that if you look at the progeny of cases that Judge Moreno cites with respect to deciding cases on letter motions, that they can be decided on letter motions if the parties are given fair opportunity. And I think that's the question here from a procedural standpoint. Did you identify anything that you would have presented that you weren't allowed to present because you used the letter motion? Well, yes. One thing that I would—of course, we're doing an over-review here. And so one thing that I would cite is if you look at Judge Moreno's order on page 3 of the order, he actually mischaracterizes the case and the argument. And what he says there is, Geico acknowledged its increased savings in costs and expenses and advertised that it was passing these savings on to consumers. To do so, paraphrasing, Geico gave a 15% discount. That is really, in this case, where the rubber meets the road because it's not about what Geico actually did. When they got their rate approved on April 29th— You're not going to answer my question of telling me where you said you had things that you wanted to present but you weren't given that opportunity in your motion to reconsider? That's what I asked. I realize you're pointing out something you think was Judge Moreno's error, but Judge Rodgers asked you several times now whether you waived this concern because you raised this procedural question. So I then asked you, where did you point out to Judge Moreno that there were things you wanted to present to him that because of the way he did the motion to dismiss, you weren't allowed to do that? And I would suggest to you that you didn't, because I don't see anything that you suggested to him that you would have presented to him. It's a simple question. Right. In the motion for rehearing, we did present the argument that we believe that the fundamental aspect of the case was mischaracterized in the order. The order is—the case is not about whether or not— and other things that would support your position so that he could then think about he should reconsider his decision. Not in a motion to dismiss, Your Honor. So the motion to dismiss, we rest on the complaint. And if you—of course, if you look at the complaint at Appendix 9 through 13, that documentation, those statistics are incorporated in the complaint. And so it would not have been appropriate to present to Judge Moreno additional documentation supporting the complaint. All right, Mr. Willey. Thank you. Your time has expired, and you reserve three minutes for rebuttal. Thank you, Your Honor. Thank you very much. Good morning. Damon Voge for the defendants. Geico. Court has asked some basic questions here that counsel, I don't believe, was able to answer because there is no answer. He was given an opportunity under the local practices of Judge Moreno to correct any deficiencies, which is the very purpose of the pre-letter motions that are submitted. And, in fact, this is in the appendix. It's a supplemental appendix, page 62. I wrote Mr. Tottani, the counsel for the plaintiff, and I asked if they were going to reconsider their positions which refused to withdraw or amend the complaint. And the answer was, as stated in plaintiff's initial response, our position is the complaint is not defective for the reasons articulated therein. They had every opportunity to amend the complaint or seek the court's involvement in a request to amend the complaint, and they stood on the complaint that is on file. The complaint is the definitive document in this case. They had every opportunity. There is no argument they presented to this appellate court that is in any way different in shape or form from the arguments they presented to the lower court. And Judge Moreno should be affirmed on that basis in dismissal with prejudice. Could you address their argument, please, that whether an advertisement is materially misleading is an issue of fact, that it's not appropriate for the court to decide on a motion to dismiss whether their claims under sections 349 and 350 are legitimate. They make, but they allege an argument that customers were materially misled by promises of savings being returned to them. And notwithstanding the whole insurance regulatory structure, that whether a customer would have been misled was a question that was not appropriate for decision on a motion to dismiss. Yes, and my answer to that, it was very clear that any reasonable consumer would have concluded that the savings, if that's a term of art and out of context, was the 15 percent. In fact, the Geico filing specifically mentions the 15 percent premium relief. It was approved by the New York Department of Financial Services. And if we go back to the complaint, which we have to do, the only allegations about what they actually received and potentially relied upon appear in paragraph 28 and paragraph 34. And both of those paragraphs are exclusive to the Geico give back program, which was a 15 percent credit on new and renewal policies from October or April 8th to October 7th, 2020 for a full six month period. Those are the only advertisements they allege they have quote unquote received. They don't allege that they went out and looked at a Web site, which is where the word savings appears. There is no allegation whatsoever in that regard. And that's why there is no damage or injury under the GBL claims here. The only reference to the savings appears in paragraph 30. But once again, they had every opportunity to say, hey, we relied on that paragraph. Not only did we rely on it, we took some action as a result of it. They've never alleged that had they known- The point is that it was defined. It was defined by 15%. So the deception has to be that, well, what they're saying is that the 15% was a deception because it didn't represent the full amount of their return. But I take it your point and what the district court seems to seize on is that because the 15% defined, the customer knew what they were getting back as to whether that was or was not the full amount of their profits or the benefit that they had because of the low accident rates. That is correct. The customer wasn't deceived in that sense. That's correct. And again, if we look at the complaint, and not what plaintiff's counsel may say in advocacy, but the complaint itself in paragraphs 33 and 34, we talk about the individual plaintiffs here. Plaintiff Grossman renewed the complaint on September 10th of 2020, and they explicitly note in the complaint that he received a $132.57 discount under the Geico GiveBack program, which is the only thing they said they ever received in advertisements, a 15% credit. And then Plaintiff Perizek alleges that on May 23, 2020, after the New York Department of Financial Services approved the Geico rate filing for the GiveBack on April 29, that he received a discount, a Geico GiveBack discount of 15% of $276.25 to the penny. So to the earlier question, there was no confusion whatsoever about the proposal or the offer Geico was making and their acceptance of the renewal terms of the discounted premium and the coverages that they received. There was no question whatsoever. And so when you look at a reasonable consumer, and this court has ruled that the court can rule as a matter of law that in the context of the information presented in the complaint, which we're not disputing, no reasonable consumer getting a 15% credit notification and advertisements saying the GiveBack is the 15% could possibly have been misled in any way, shape, or form. And that claim can be resolved independently of any application of the filed rate doctrine? Is that your view? That is correct. There's two fundamental reasons this court should affirm. One, the filed rate doctrine is a longstanding doctrinal rule of law, not only in the Second Circuit, but in the New York State courts. We've cited a number of cases, and I believe some of you have been involved in some of those cases. The filed rate doctrine is sacrosanct. In New York, at the empowerment of the New York legislature, which has the ability to shape public policy, they have delegated the complexity of auto rate setting and auto rate approval for millions of customers in the state of New York to the New York Department of Financial Services. Under the law, again, promulgated by the legislature, there are rules that the DFS has to enforce that include prohibiting, quote, unquote, excessive premium. In the complaint, no fewer than 31 times do they refer to excessive premium, and they refer to it each of the three individual counts, and in their prayer for relief, and in the class action allegations. It's clear- The New York Department of Financial Services have either required a greater rate reduction, or larger give back, or impose some retroactive requirement for a premium refund. And I realize these are different questions. But to acknowledge the extent of the savings, as those became clear, the change in the economic situation for the purchasers of insurance, as well as the providers of insurance. Precisely. And in the supplemental appendix that GEICO submitted on page 21, if you look at the actual approval by the regulatory agency charged with the complexity of auto rate filings, that says the approval is hereby granted on the basis as the loss experience for the period of the state of emergency fully emerges, a more robust analysis of the short and long-term impacts of COVID-19 stay-at-home measures across New York, on both the company's historical and prospective loss experience, will be performed and provided promptly to the New York DFS. Further, to the expectation that the company, and this is important, will incorporate such analysis, including appropriate further rate adjustments, as part of its future New York private passenger automobile rate filings, the DFS may consider whether the company's shelter-in-place program has been applied in a manner consistent with the standards of NYIL Article 23. That is the file rate doctrine right there. They've approved the rate. The policies were renewed after the approval. They received the credit exactly as GEICO had filed it. They allege that that is the only thing they relied on was information about the give-back and the 15%. And this is precisely why this is within the exclusive jurisdiction of the New York Department of Financial Services that regulates whether or not rates are excessive, not only for the rate that was approved here, but for future potential refunds. Is there a process, an administrative process, for consumers of insurance to complain about rates? Absolutely. There's always a robust consumer complaint process. And I think I can say this, that the New York Department of Financial Services is an esteemed regulator in the United States. It's a bellwether regulator. And they are not shy about taking enforcement action and ensuring that insurance companies are in compliance with these very laws and the rate setting and rate approval process. And the file rate doctrine says even if there's alleged inequity or misconduct on the part of the defendant, the filed rate doctrine essentially is sacrosanct for these very reasons. You have a very sophisticated department in this state. These rate filings are hundreds of pages long. There's lots and lots of issues that go into it. It was filed. It was submitted. It was approved. And it's exactly what the plaintiffs got here. And they accepted those renewal policies with the 15% calculated to the penny. There was absolutely no confusion or deception of any kind. Thank you very much. We'll hear rebuttal. The filed rate doctrine is sacrosanct, but this is not a filed rate doctrine case. No court that has looked at this, including the California Insurance Commissioner. Excuse me. You are claiming that the premiums charged were excessive, don't you? That's correct. But if you look at the complaint at paragraph 30. Doesn't that implicate some criticism of the doctrine that was filed and accepted by the New York Department of Financial Services? No, Your Honor, because on paragraph 35 of the complaint, you will see that appellant purchased that renewal policy that Mr. Vokey cited on April the 3rd of 2020. This rate, the giveback rate, was not filed and approved until April 29th. Do you allege that GEICO ever charged a rate to your clients that was not approved by the New York Department of Financial Services? Your Honor, yes. It was on April 3rd of 2020 when GEICO had already represented that they were passing the savings on renewal policies onto the consumers, as alleged in paragraph 35, and our appellant purchased that policy. The 15% was at that point not a filed rate. So it was not filed, and this is in the appendix, until April 29th, and it was filed by Mr. Vokey. But even if it had been, that's not what this case is about. It's not about – GEICO had full measure to give 15% back and to get that rate filed and to charge consumers that. But what they can't do is represent to consumers that we're passing the savings from the COVID-19 pandemic on to consumers. How do you define the savings? Where do you draw the line? So that is in the complaint, and, Your Honors, we have a table. That we have provided. Are they entitled to make a profit? Your Honor? Are they entitled to make a profit? Of course. Any company is entitled to make a profit. But what they're not entitled to do is say we're passing the savings as a result of the COVID-19 pandemic on to consumers and then not do it. Which is what they did. They induced consumers because consumers have a choice. They could decide that we're not driving. We're not driving to work. Didn't the approval by the New York State Department of Financial Services determine what then was the reasonable rate to expect into the coming year with regard to reduced exposures for automobile accidents and individual liability there under on their policies? No, it didn't do that. What it did do – That's exactly what it did do. That's how it sets the rate. Well, I disagree with that. What happens procedurally on the administrative side is the insurance company submits a rate and the regulator approves the rate. Based on what? Based on what the insurance company and other entities submit. And the regulator's projections with regard to actuarial projections with regard to exposures. Right. Correct. The difference here is that that was a month after Appellant renewed the policy on the basis that GEICO had represented to its customers that they were passing these savings on to consumers. And if you look at the complaint – Did GEICO tell its customer what the percentage of rate – percentage they were going to get? No, but under the contract they have a duty to act – Well, wait a second. Didn't it tell them 15 percent? No. It did not? Not in that initial statement. Didn't – so you're saying the initial statement defines the whole claim. Is that it? Correct. The initial statement says we are passing these savings on to consumers. All right. They did not do that. I'm a little confused as to your assertion on that because in the end they had to get regulatory approval for their rate, right? Correct. So to that extent the approval works backwards because they could not have pursued that rate without getting approval. It's not – Or is that not the way to look at this? Respectfully, Your Honor, that's not the way to look at it. The claim is not about the rate that was approved. It is about the rate and what GEICO represented to its consumers about the rate. So appellant had a choice when he renewed his policy on April 3rd. He could have decided that I'm not driving as much, I'm not taking the kids to school, I'm not going to work, I don't need auto insurance. But GEICO had told him – He doesn't need auto insurance. He has to have it in New York. Not – if he's driving – if he's driving. If he owns a car and he puts the car on the road, the law requires him to have auto insurance coverage. Correct. If he's driving. You're saying he would have given up his car. I'm not – I'm saying he had an option as a consumer in the marketplace. You know, this starts to be a fanciful argument. I disagree. You haven't alleged that your client, had he been told the facts as you say they were, would have given up his car insurance. Not required to allege that in the complaint. The question is, when GEICO says we're passing these savings on to consumers, and all of the data, including their own data in the appendix, suggests that they did not pass these savings on to consumers. They passed a portion of the savings. I'm not making myself clear. Let me try again. GEICO gave them a rate on April 3rd, which they then sought approval for. They could not have maintained that rate without the agency's approval. Am I right? That's not correct. They could have had a rate without agency approval. The rate that was given on April 3rd. So the way that the give back worked is it was a credit on renewals in the future. And so the rate given on April 3rd to the consumer was a normal rate, but it had already been represented that these savings were going to be passed on to the consumers in the terms of a rebate, in terms of a give back on a renewal. So the rate on April 3rd is not the issue because the rate was not even filed and approved until April 29th. And you're telling me they didn't tell them that it was going to be 15%? Correct. When did they find out it was going to be 15%? When they got the bill, which Mr. Vokey cited the date, which was sometime thereafter. But the renewal was before that, which is why it's a very distinct claim. It is the consumers that purchased or renewed the policies based on that statement. Is this so as to both of your clients or just one of them? So there's two separate clients and two separate claims. So there was one client that renewed the policy prior to the rate being filed and approved, and there was one that was after. The one that was after, did he know it was going to be 15%? What's that? He did, didn't he? The one who applied or renewed after the approval of the rate, did he know it was going to be 15%? He did not. Based on the complaint, he did not. Don't tell me based on the complaint, please. You're asking a factual question about what a specific client knew. The legal issue with respect to the complaint is whether or not GEICO lived up to its end of the bargain, what they had represented to these individuals. Thank you. Okay, Mr. Willey, thank you very much. Thank you. Just one question. Sure. If I understand your assertion that the April 3rd to April 29th conduct is a specific claim, I'm still having trouble understanding why it's not a rate claim. Because you are saying that when they renewed on April 3rd, they renewed at a rate that didn't give you the benefit of the savings that they represented. That seems to me to be a rate claim and therefore falling within the failed rate doctrine. Why is that not how to look at your assertion about that one month period? Yes, Your Honor, because it's a representation claim. If GEICO had not said that they were… Representation as to what? GEICO said that they were passing the savings, the entirety of the savings as a result of… In a rate, in a reduced rate. No, that is not what the statement says. That is what I understand Your Honor is saying. Don't you expect a check to be sent to your client? No. What happens with respect to the rate is they can file a rate, but what GEICO said is we're passing these savings, the savings from the COVID-19 pandemic, for hundreds of millions of dollars in New York savings onto the consumers. They did not do that. They passed a portion. In a reduced rate. That's how the consumer would get it, in a reduced rate. Well, they could have done it one of two ways. They called it a giveback, so technically they could have done a refund check, or what they did in this case is they said we are going to reduce any renewal or new policy purchases, which is a whole other issue. Did you say that in the complaint? Yes, we did, and there's a group of consumers, by the way, which did not get… So you did say that it would be given in a renewal, I don't know, the renewal rate, right? Yes, correct. So you did say rate in the answer to Judge Rogers' question. The word rate, yes, appears in the complaint. The issue is that the rate was not approved at the time that the consumer purchased the renewal. All right, thank you very much. Thank you both. We'll reserve decision.